Good morning, Mr. Williams. If you are prepared to go forward, good morning, Your Honors. May it please the Court, Counsel. I'm here today on behalf of Frank Belline. The appeals after negotiating the guilty plea entered on May 22, 2015 to two counts, one of retail theft and one of attempt theft by deception, which are both Class 3 felonies. The attempt theft was a reduction from a Class 2 charge. He agreed to concurrent 30-month terms of imprisonment in exchange for the guilty plea with credit for time served from January 29 of 2015. When someone has a guilty plea, Your Honors, I think one of the most basic questions he or she could ever ask his attorney is, how much time will I have to serve? How long will I be in prison? Mr. Belline asked... Is that the same question, though? What's my sentence versus... Well, the sentence is a known number. Given that known number, how much am I actually going to have to serve? That's the key question here. And that's specifically what Mr. Belline asked his attorney. Give me a breakdown. How long will I actually be in custody with these sentences? And what the attorney told him was, you get credit for time served from the date you were arrested. He said you get day-for-day sentence credit, so you'll do 15 months. And he said you'll get six months of credit as a first-time offender, first-time nonviolent offender. According to the defendant, the attorney disputes whether the word nonviolent was in there. But six months is a first-time offender, meaning you'll do nine months. The fact that he would only do nine months from January 29, 2015 is crucial here because that would give him a release date of October 29, 2015. Well, we already know that that was important because he had turned down a four-year offer, I think. He had turned down a four-year offer, and here's where his job comes into play. He had a 20-year job with American Airlines. He had went on a leave of absence as of January 2015. On the day of the plea, there had been a 402 conference. Two days before the plea, after the 402 conference, when the 30 months was the proposed offer, he asked for time to go to check into something, to consider the offer. So they set the plea for two days later. In that time, he contacted his union. His union got in touch with American Airlines for him, and he was informed, if you come back to work by November 1, 2015, you will be able to keep your job. So that's why the nine-month figure that the defendant thought he was getting as the amount of time he would actually serve was crucial to him. He verified he could get the job. Did he tell the judge that? No. Okay. No. This is between the defendant and – our argument here is based on ineffective assistance of counsel for giving the wrong advice about the six months. Right. Now, the judge seemed to have a concern when the motion to withdraw the plea came, that he had sufficient contacts with the system that when he was asked, were any promises made to you, he should have spoken up? Well, two things on that. First of all, yes, he had a prior record of contact with the system. But he had never been to the Department of Corrections before. He had no reason to know how good time – how sentencing credit worked in the Department of Corrections. There's nothing in his background indicating he'd ever been to the DOC before. So he – so I think the judge assumed too much knowledge there for somebody who hadn't been to the Department of Corrections. The defendant, even in the first of that fact in his testimony, this was my first time as well. Wait a minute. What basis is it for the judge to have made too many assumptions? Can't this trial judge rely just on what's said in court? Did anyone make any promises to you? The promise – Yes or no. The defendant picks his answer. First of all, yes. Based on his background and experience. Okay. Do that. It's not for me to intuit whether or not that person has been to the Department of Corrections or not. Well, I thought Justice Hutchinson was asking about the perspective of the second – the judge at the time of the motion to withdraw the plea as opposed to at the time of the plea itself. Right. At the time of the plea, the judge – well, I'll point out a couple things. First of all, the question was didn't – was anyone threatening you or forcing you or promising you anything to plead guilty? The defendant answers no. Well, in fact, there had been a – there had been a negotiated plea here. He was promised something. The promise was the 30-month sentences. Normally, you see that question couched in terms of beyond the terms of the negotiated plea. Has anyone threatened you or promised you anything? Here, the question was just a straight promise. In fact, the defendant's answer probably isn't even accurate to that question because there had been a promise. It was for 30 months. The promise was for the 30 months. It was between the defendant and his attorney. What does that 30 months mean? How much time am I going to have to serve if I accept that 30-month sentence? That's between the defendant and the attorney. That's why we have to go to the motion to withdraw the guilty plea to litigate, to bring out the facts of what happened between the defendant and his attorney. The mere fact that this routine question is asked, were there any promises, doesn't knock out the issue. The Boyd case, which we added as authority, had the exact same question. The Brown case in the Supreme Court had the exact same question. And it's a very secondary mention of that fact in Brown opinion at the very end after they've analyzed all the other factors. That's in no way a dispositive factor against us that this routine question about a promise was asked. The defendant did not bring this out at this point. He didn't take it as a promise. He took it as a fact. And that's what his testimony was. And the attorney testified, yeah, it was pretty much like he said. This was conveyed to him. You get the 30-month sentence, you'll do nine months. That's what was conveyed to the defendant. That's what was in the defendant's mind. And that was a crucial figure because of the job offer. But the case that you asked additional authority or supplemental authority, which we have granted without answer by the state, because the time is so short they can respond here today, there was a mistake made there. He was not eligible, period, to get any of that credit. This is not the same situation here. There's still a mistake by the attorney here, Your Honor. What's the mistake? Telling him he will get the six months when it was totally in the discretion of the Department of Corrections. Didn't the trial court make findings of credibility that the attorney was more credible than the defendant? The attorney's testimony is the same as the defendant here. If any contrary finding is against the manifest way to the evidence here, Your Honor, it would be my position on this record. But doesn't, I mean, the attorney keeps saying it's if and may and could and might. Well, first of all, what's in the defendant's mind doesn't, what's in the attorney's mind doesn't matter. The attorney said, well, I probably presumed it. I thought it was highly likely. Well, it doesn't matter what's in the attorney's mind. What matters is what he says to the defendant, and he says such things to the defendant. If you've never been to the Department of Corrections before, I don't see any problem with you getting that credit. Does that mean you will get it? That's certainly how the defendant took it, and I think objectively that's very reasonable. And, again, look at the Boyd case. That was those, the words there were, well, you may get day for day, you may get additional credit. You did get day for day in Boyd because you simply was not eligible. But, again, it's in conditional language there. So in our language, it's much stronger from the attorney to the defendant here. The attorney first says, well, it was pretty much like the defendant said. Then he starts hedging. Well, I strongly suggested it. Well, I thought it was at least, I conveyed that it was at least very likely. I projected it. And then he finally says the statement about, well, if you've never been to the Department of Corrections before, I don't see any problem with this. That gave the defendant every reason to believe he would get those six months of credit. And those were crucial to this particular defendant. I would also point out in the Correa case, the lead case from the Illinois Supreme Court, misadvice from the attorney about collateral consequences. Conditional language was used there. The attorney said, well, I don't think you'll be, that was a deportation case. I don't think you'll be, you probably won't be deported. Then the defendant said, well, my wife's a U.S. citizen. Oh, well, then I don't think you'll be deported. So he couched it in I don't think. The fact that it's not, the words promise or guarantee are not magic words in this situation. I think that's how the trial attorney, the trial judge treated this. The judge, when he was moving out of the motion, was drawn to guilty plea. But in fact, in Correa, the law was clear that that person would be deported. The Correa decision doesn't really discuss that, Your Honor. In Lee versus United States, it's clear the defendant would be deported. I don't believe in Correa. I don't think the Illinois Supreme Court goes into the deportation law too much in Correa, Your Honor. So to my recollection, I don't know if there was a definite in Correa. There is a difference. I mean, you would see a difference, wouldn't you, in someone who definitely will need to be deported and then the attorney says, I don't think you'll be deported, or someone who definitely is not entitled to day-for-day credit and the attorney saying, I think you're entitled to day-for-day credit. And then in this situation, the attorney is saying, I don't see any problem with you getting it, and he is eligible for it, and at least in this attorney's experience, his previous clients have received it. Well, that doesn't make sense to me, Your Honor, and here's the reason. The supplemental good time statute that we now have in Illinois says you get earned credit for good conduct in specific instances. The attorney advised me that if you get these six months walking in the door, in no way does that statute provide for that. The statute is in the sole discretion of the director. If you do something while you're in there, you can get awarded the credit. This is not an automatic and certainly not a walk-in-the-door credit where they immediately would calculate his sentence at nine months the minute he walked in the door. That's not understood before. Before Governor Quinn had this issue, pretty much people did get that credit. I mean, people walking in the door, they would do their 59 days or whatever and they'd be out. Well, and part of the problem is they wouldn't even make you do the 59 days. The 59 days was really only to get Medicare or some federal subsidy, and if they were really overcrowded, they didn't even wait for that money. Absolutely. I don't deny that, and the fact is that changed. But the attorney advised this defendant like there had been no change, and that's what's wrong here. The automatic, it used to be called meritorious good time. The word meritorious is not in there anymore, and there was obviously actually no merit involved. It was being automatic. But that's what an experienced public defender should know. Yes, that was true around the late 2000, before 2010, let's say, but it's not true in 2015. So is it your position then that a public defender or a private counsel should not give advice? Well, advice, you can certainly advise your client these are potential extra good time credits that are available beyond the day for day or the 85 percent or whatever it might be. And how do I get it to the defendant's mind? Because you keep saying this may be what the attorney said, but this is how the defendant heard it. Because the defendant testified here. Right. We know how the defendant heard it. Right, but let's go back to before the fact. What should an attorney say to his client? And then be sure that the defendant is hearing it, the same one. How do we ever address these? What I say is this particular attorney on our record used much too positive language, much too no question about what you're going to get these six months credit. What the attorney needs to say is, well, the Department of Corrections, you look at the statute for somebody in your situation, you might earn credits for, you would be eligible to earn credits for educational programs, for mental health programs, whatever other sort of programs the Department of Corrections went over. And you might want to hear that to say, oh, okay, that's all I've got to do, uh-huh, and I'm going to get that six months credit. That's where this particular defendant's job comes into play, Your Honor. This defendant had a very specific, we have the record here where the defendant had a very specific reason. I'll give you prejudice. Where's the deficient performance? Making the defendant think this was a sure thing. The defendant thought he did. Is it what the attorney did or is it how the defendant heard it? Both. What the attorney said caused the defendant to hear it the way he heard it, but that was a totally reasonable way. We're looking for objective justification for what he did.  Based on how it's interpreted by his client, who certainly has a motivation down the line to have heard it differently. Well, first of all, the defendant, the minute he got to the Department of Corrections and found out he didn't get the credit, he started filing things in this case. This defendant didn't wait until down the line. No, no, no. What I mean is it's after the plea. When he had his opportunity to say, wait a second. But he was promised 30 months. That was the promise at the time of the plea. It was the attorney who explained to him, how much time will you actually serve? And the attorney explained that in a way where the defendant absolutely thought he was going to. That's my point. The defendant thought. And how do we set a standard for attorneys based on a subjective what the defendant thinks? No, the case says you look at the objective factors. And I'm saying what we have objectively here is what the attorney said. And in this case, I say the attorney objectively conveyed you will get those six months credit. I guarantee. The defendant took it without using the word guarantee. Yes. Well, I mean, isn't that the law? Yes. Did the attorney guarantee? It is not the law that the word promise or guarantee has to be in there, Your Honor. All right. It's not there in the case law. It's not there in the cases we're relying on. Yes, you. Yes, the defendant took it as a guarantee. But it's because of the way the attorney conveyed it, we have the necessary objective justification for our position for the defendant's interpretation here based on his own testimony and what the attorney says about it. What if, I mean, we can't know this, but what if when the public defender goes in and says, okay, this is the best deal you're going to get, you know, this is going to be a really long haul, but I think you might get the good time credit. Does it make any difference if he's smiling or if he's scouring? I mean, we can't know those things. But that's, well, first of all, that's the whole reason you have the hearing on the motion to withdraw the guilty plea is to try and bring out those objective facts. But, again, you use much more conditional language there than this attorney used. Again, the attorney acknowledged, yeah, it was pretty much like the defendant said it was, which was conveyed to him as a fact that you will get the six months of credit. And that was just wrong. It was overly optimistic, whatever you want to call it, reading of the statute as it now is and of the application of the statute as it now is. In no way is this walking the door, you know, I'll speak anecdotally, we don't have clients in our office who get six months of good credit walking in the door. That doesn't happen. And nor does this look at the language of the statute. Three, three, three, three, three, three, three. The language is, again, it's earned credit for good conduct in specific instances. There's a defendant. You can't earn credit for good conduct before you ever get there. It's wrong to tell him you're going to get it walking in the door. And it's and it's far from automatic. And by the way, you don't know it. And you admit he did not say you're going to get it walking in the door. He said that this is this is what I know. He told him how that would be calculated right off the top. He essentially told him you get it if you're walking as he was walking in the door. But he didn't say that. So we can't say. But nor did he use any word like discretionary or any suggestion that somebody was going to rule on this later. The word discretionary doesn't appear in anybody's testimony. In this case, this part is what was conveyed between them. Doesn't he use the word may repeatedly in his testimony? No, not may. Not may, Your Honor. It was all stated more strongly. I told you it was at least very likely. I strongly suggested, rejected. The word may is not in there. And when he testified, unless I, you know, I'm overstating this, he said at the point of testimony, when your client is going to spend his time, he continued to believe that he should have received it. What does that mean? Well, I mean, when the client got to the Department of Corrections, he certainly thought he should and was going to receive it, and then the minute he found out otherwise, he started challenging this plea because he realized they're not giving me the time. I'm not going to save my job. This isn't what my attorney told me was going to happen, and he immediately starts trying to challenge it. One last question. If we were to agree with you here, your client served a sentence, what's going to happen? The plea is withdrawn. It goes back and starts over, and he has to defend against the state. He understands that. He understands that, and it's also in the transcript from the hearing on the motion to withdraw the guilty plea. Judge Kinsella asked that, and the attorney below confirmed that. He does wish to take this back. Well, and now here's another interesting question, and maybe he can't answer it. He understands that this is not going to get his job back. He's already lost his job. I'm sure he knows. Yes, he understands. He understands his job is gone. I don't want to see the 3rd District handling this because you told him he'd probably get his job back afterwards. Okay. Thank you. Good morning, Ms. Hoffman. Good morning, Your Honor. Just going to please the Court, Counsel Lisa Hoffman, Assistant State's Attorney, on behalf of the people. Well, discretionary time is a conundrum. Collateral consequences are somewhat of a conundrum for the guilty plea defense counsel. And I do think we should start from the standpoint that the State of Illinois still recognizes the difference between direct consequences of a plea and collateral consequences of a plea. Can I ask you a quick question? Yes. Did the statute change in the way that Mr. Lilliman said that now good conduct is only earned through specific instances of good works? No. It did not change between the time that, as of May 22, 2015, the statute read, the director may award up to 180 days additional sentence credit for good conduct in specific instances as the director deems proper. You know, this kind of good conduct credit, discretionary good conduct credit, is fluid. The Department of Corrections has discretion to use it for many reasons, I suppose. They can use it as a carrot. If inmates' behavior is good, they have this to look forward to. They can use it as a management tool, I think Your Honor observed, when they're trying to deal with population shifts. And that's why it says the director may award it in certain circumstances as the director deems proper. So then the question is, what does counsel tell a defendant in order that he or she provides appropriate information going in so you know what you're looking at? Because if I don't tell you that there may be six months of additional credit and you don't take the plea and you get more time and you go in and you find this out, then we see you coming back and saying ineffective assistance of counsel for not advising me that I was potentially eligible for this, which would have changed my mind about taking the plea offer. So I think in this instance, what counsel did was the only thing you can do. You explain to your client that this is how it works. You get certain day-to-day credit that you're eligible for over here, and you may be eligible for this credit as well. My experience is that people in your position usually get that credit. If you say that it's my understanding or it's my experience that people in your position, how is that different than you're going to get good time credit? Oh, I think it's very different because, again, you're putting defense counsel in catch-22. If I don't tell you you may get it, you won't like that for some reason. And if I tell you you'll probably get it, then we're here talking about the fact that I didn't get it. I think that the record in this case is clear that this was not a guarantee. It was not a promise. Mr. Lillian suggests that those are not important or significant terms. I wholeheartedly disagree. I think if you say to your client, oh, you're going to get day-for-day credit, you're going to get six months credit, you're going to get blah, blah, blah, that those are equal things. Now you're telling the client that they're going to get something which they may not get. But to give the client your best advice based on your experience as an attorney, which is exactly what the public defender testified to at the hearing, this was my experience. My experience was people going to the Department of Corrections for the first time usually get the credit. Or should it be, in my opinion, you might get it. What's the difference? You're going to jail, not you, but you're looking at going to jail, and you don't want to go. It's your first time there. You're looking for any straw, and your attorney says, in my experience, in my opinion, it's my understanding. Well, that one, no, we'll take that one out. It's what's happened to other of my clients. You're going to get six months, you know, right off the top. What do you hear? You're still hearing, you know, you're going to get it, aren't you? I do not think I would hear that. But you're not going to jail. And if I am, I would be well-prepared to know. Listen carefully. How would you be prepared? Well, you're not going to jail either. If you're a defendant, how would you be prepared? I would listen to my counsel. I would, you know. And what is it that your counsel is telling you? Is it advice, or is it a representation? It's advice as to collateral consequences. How do you know that? How does the defendant know the difference between, look, here's the elements of the theft you committed versus here's what's going to happen when you get into the Department of Corrections. Which one is opinion? Which one is fact? And how does the defendant know that if you don't tell them the difference? Well, I think your language tells the difference. And in this instance, I guess I do take issue with one description that Mr. Lillian had, which was that discretionary doesn't appear a record. It most certainly does. On May 7th of 2015, Mr. Gifford sent a letter to the defendant with the state's offer, which at that point was four years. And it specifically said if you qualify potentially sooner, it gave a date, January 30th of 2017, and potentially sooner if you qualify for any additional discretionary good time credit. I know, but now he's getting a 30-month sentence. I don't know that that still applies. He's getting a 30-month sentence. I don't know that that still applies. He told me in a four-year sentence that applied. That may not apply in a 30-month sentence. Or that it may be indefinite. I'm going to get it. It's not discretionary anymore. I don't think the defendant ever testified to that understanding. In fact, the defendant himself testified that his counsel never promised him anything. He said he made a statement. I know, he doesn't have to. Didn't he testify that he didn't get that letter and apply it for the plea? He didn't testify that way. It's unclear. He clearly did get that letter, a copy of that letter, again, after he was at the Department of Corrections. When Mr. Gibbard sent him the letter in September when the defendant said, hey, I didn't get my credit, and Mr. Gibbard sent him the letter saying, you know, I certainly never guaranteed you anything, and then with the P.S. I think you'll probably may still get it. At that point, he apparently also sent copies of previous correspondence. The defendant actually never says that he didn't receive that letter. They go round and round about when he was in the Department of Corrections or when he was in jail when he was in the Department of Corrections. But there's no testimony that he didn't get the letter. There's no reason on this record to assume that he did not. And, again, when Mr. Gibbard testified at the hearing, he said things like, I told him I don't see a problem with this. I think it's likely, based on my experience, that you would get this. But he also said, I certainly never guaranteed him. I do not guarantee my clients this. I certainly never said you will absolutely receive it. So, again, I guess Mr. Gibbard is doing the best that Mr. Gibbard can do with his information. He is telling the defendant, these are the possibilities available to you for the amount of time you'll serve your sentence. I absolutely agree that most defendants are very interested in how much time they'll serve. But I think that asking that a defendant, a defense attorney, not, basically what we're saying now is you can't give any information based on your own experience and your own, you can't give advice like that. Because if you do, then they leave the defendant down a criminal's path and he's with the rose-colored glasses how it would be, and they won't like it and they'll be back to complain later on, and then your performance is deficient. And there aren't any cases that suggest that this kind of advice is deficient. In fact, the cases that Mr. Lillian cites are all cases in which the defendant was not eligible for the kind of credit that, or in the case of deportation consequences, the consequences were certain based on the defendant's steps. So, for instance, in Boyd, the defendant had been convicted of armed robbery. Armed robbery is excluded from that day-to-day credit or 50% credit by statute. In Lee, Mr. Lee faced deportation consequences that were fairly certain. Those are the cases that he's citing in support. This is a different matter. That's why collateral consequences are different than direct consequences. And, yes, Lee does tell us, as did Padilla, that in certain circumstances, collateral consequences can bleed over and sort of become direct if your counsel gives you absolutely incorrect advice. But that's not what happened here. What happened here is Mr. Boleen heard what he wanted. I mean, he heard something. That's not what was told to him. No, he heard that I'm eligible for good time credit. This guy is an experienced lawyer. I got a good lawyer. He's telling me in his experience I'm getting out six months early. With all respect, Your Honor, you said exactly. You're eligible if it's available to you. I mean, that could happen. Does he give him a dictionary definition of eligible? No, and I don't think he has to. And if that's where we end up, that's going to be a – collateral consequences have been chipped away at. Perhaps some of that is because guilty pleas are so much more common than they were in the past. Maybe that's the pendulum swinging a little bit. But certainly they've been chipped away at over the last several years, if not decades. But in this kind of a jump from, you know, I've given you absolutely incorrect advice. In other words, like in, boy, you are not eligible for this time, but I told you to get it, to I told you that, in my opinion, you will likely get this discretionary time. If that becomes now the basis for withdrawing a guilty plea, I think that we will be opening – I hate to use the term floodgates. I just couldn't think of a synonym right now. But the proverbial floodgates to – and making – and putting defense counsel in a terrible Catch-22 situation. Should the court inquire specifically, as they did about – has anyone made any representations to you about your deportation status, etc.? Should the court inquire? Has anyone represented to you what this 30 months or this five years or whatever means? Do you understand you will serve blah, blah, blah? Do you understand you will or will not? Good. No. Deportation is covered by a specific statute in our state, so obviously it is always my hope that the court will inquire properly under that statute. But I don't have any such statute with respect to credit. That's my question. Should we? I guess my – I mean, you just said about floodgates. Would this fix that? I don't know. I think at this point we've got so many things that a court has to address. Right. And then, even then, do we – when the court starts to address you about it, now are they using – are they forced to read – Substantial compliance. But substantial compliance. In this case, if I say, well, you know, I indicate that I don't see a problem with your getting it. Well, I don't see a problem with your getting it. Maybe. No, the court is not there to give advice. My question is, should the court ask the defendant, has anyone made any representations to you about the time you will actually serve? Yes or no? No. If the answer is yes, well, what did they tell you? My answer is no, they shouldn't make that inquiry. I think the court makes the inquiry, have any promises or threats or whatever been made to you. And I suppose at that point, if there remains any question in the defendant's mind, that's the opportunity to say, well, I understand this. But no, I think at this point, my answer is no. The court should not inquire about how the defendant has understood representations made by counsel. Those are matters between counsel and the defendant. Well, you know, you said that the court has a lot to do. They shouldn't be burdened with other things. They can read a case and find a script about how to say it right because we do that on a regular basis. Why would this be such a burden? It's just adding a case for them to read and put it in a bench book somewhere. Oh, I got a guilty plea. This is what I'm going to do because the court said I should. And it won't necessarily be this court. It could be a Supreme Court. It could be the Supreme Court of the United States. There are scripts everywhere for this. I suppose that in a perfect world, there would be a script that would cover every conceivable thing that might go through a defendant's mind and make sure that there's complete clarity, but we don't live in a perfect world. And so I guess I don't – I'm certainly – it's not exactly that I think the barring some particularized language and, again, even when you have to give admonishments under 604 or 615 or, again, 113.8 for the deportation was substantial complaint. It seems to me that we're just rolling down the slope. Obviously, if the court deemed to suggest that trial courts do that, well, hopefully they would take that advice to heart and do so, and perhaps that would be more clear. But in this instance, this record does not indicate deficient performance. Thank you. Thank you. Mr. Lillian, you may proceed if you wish. One thing I might point out to follow up on one of the last things, Your Honors, we're talking to counsel about, Section 138.4 of the Criminal Code has been amended to add a lot more admonitions about things we might have formerly called collateral consequences. It has been expanded, and to answer Justice Jorgensen, I think it would be very good practice to give the sort of admonitions or advice. What have you been told about what that means you'll actually serve or how much time you'll actually be in custody would be a good thing to advise a defendant of. But in this case, it is still our position, no one tells a defendant this good time was discretionary. And I did look back through the transcript, Your Honor, Justice Jorgensen, while counsel was talking. Counsel did not just use the word may at any point in there. It's at least very likely, strongly suggested, projected, it is much stronger language than just a hypothetical may. No one tells this defendant that the six months were discretionary. With reference to the May 7th letter, Justice Hutchinson, your point was correct, I believe. The defendant didn't know that what he was told in connection with the previous offer that he didn't take, that there was something about discretionary good time. When he gets to this offer, the 30-month offer that he winds up taking, he's told he gets these six months of credit. These six months are in no way conveyed as being something discretionary or having been covered by that discretionary reference in the previous plea. This plea, remember, the charge in the case with the class 2 was reduced to a class 3. This is the first time he's looking at a plea just to the class 3s and what the potential sentences would be. He had no reason to believe what had been said in the previous offer applied to this. So you would agree that giving advice is not deficient performance, even if that advice turns out wrong, correct? Correct. If it's properly referenced, yes. I mean, because if this attorney had told him, I've been in front of this judge for 10 years and I think you're going to get the same advice every time. I mean, that's just advice. That's just. Right. And then there's case law saying that's, I agree. But then if there's a promise or a statement made like, you will get this credit so don't worry about it, then that's certainly deficient performance if he doesn't get it. Right. That's deficient performance. And so, but in between is this massive gray area of gradation between advice and promise. I understand. Your Honor, unless this is more clear. Yes, yes, Your Honor. I'm saying this comes out on the promise side of the line, if you want to say it that way. You know, I think as far as what the attorney advises, the attorney here certainly could have said, okay, you get day for day good timing, which is sort of the standard thing. But then you have the potential or you might be eligible for all these different things. That's as far as the attorney should have gone. Not anywhere near as definite as he was about the six months in this particular case. And I would point out, the attorney in this examination here even admits, I changed my policy on how I advise clients after this. He knew he had over-advised Mr. Boleen about the certainty of getting this credit. He said, oh, well, not after this experience. I know I shouldn't be advising clients that way. He was treating this as much more automatic than it was after the Governor Quinn problem. And this credit is not a sure thing, not nearly a sure thing, and certainly not a walk-in-the-door sure thing, which is essentially how he conveyed it to this defendant. For this defendant, it was rational under the circumstance, it's rational under the circumstances of the case to want to take back the plea or it would have been rational not to have taken the plea if he were not convinced he was going to only serve nine months of the time. Any further questions? Thank you. All right. Thank you, counsel, for your argument today. We'll take the matter under advisement. We will issue a decision in due course. And we will now stand in a short recess to prepare for our next case. Thank you.